# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

E. SPIRE COMMUNICATIONS, INC.
AND ACSI LOCAL SWITCHED SERVICES, INC.
D/B/A E. SPIRE COMMUNICATIONS,

        **Plaintiffs,**

vs.                                                                    NO.    CIV 02-0495 LCS/RHS

E. SHIRLEY BACA, JEROME BLOCK,
HERB HUGHES, LYNDA LOVEJOY,  DAVID
W. KING, Commissioners of the New Mexico
Public Regulation Commission; THE NEW MEXICO
PUBLIC REGULATION COMMISSION; and
QWEST CORPORATION,

        **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendant Qwest's Motion for Partial Summary

Judgment (Doc. 8), filed on August 12, 2002, Defendants Baca, Block, Hughes, Lovejoy, King, and

the New Mexico Public Regulation Commission's (collectively "NMPRC") Motion to Dismiss (Doc.

22), filed on October 15, 2002, Defendant NMPRC's Motion for Partial Summary Judgment (Doc.

23), filed on October 15, 2002, and Plaintiff e.spire Communication, Inc. and ACSI Local Switched

Services, Inc. d/b/a e.spire Communications ' (collectively "e.spire") Brief-In-Chief (Doc. 39), filed

on January 27, 2003.  The undersigned United States Magistrate Judge, acting upon consent and

designation pursuant 28 U.S.C. § 636, and having considered the record, arguments of counsel,

relevant law, and being otherwise fully advised, finds that Defendant NMPRC's Motion to Dismiss

should be **DENIED**, that Defendant Qwest's Motion for Partial Summary Judgment and Defendant

PRC's Motion for Partial Summary Judgment should be **GRANTED,** and that Defendant NMPRC's

Final Order on Recommended Decision should be **AFFIRMED**.


I.      **Introduction**

        e.spire alleges claims under the Telecommunications Act of 1996, specifically 47 U.S.C. §

252(e)(6), as well as claims for deprivation of due process, equal protection and an unlawful taking

under the United States and New Mexico Constitutions.  e.spire seeks declaratory and injunctive

relief, with respect to Qwest and NMPRC, as well as damages from NMPRC under 42 U.S.C. §

1983.

        A brief review of developments in the local telephone service industry over the past two

decades is necessary to place this case in proper perspective.  Before the 1990s, local telephone

service was provided through state-sanctioned monopolies.  *U.S. West Communications, Inc. v.*

*Sprint Communications Co.*, 275 F.3d 1241, 1243 (10th Cir. 2002) (*citing AT&T Corp. v. Iowa*

*Utilities Bd.*, 525 U.S. 366, 371-73 (1999)).  By the early1990s, technological innovations rendered

the monopolistic system obsolete by permitting competition among multiple local service providers.

*Sprint*, 275 F.3d at 1243.  Congress responded to these changes by enacting the Telecommunications

Act of 1996 ("the Act"), 47 U.S.C. § 251, *et seq*., with an intent to "promote competition and reduce

regulation in order to secure lower prices and higher quality services for American

telecommunications consumers and encourage the rapid deployment of new telecommunications

technologies."  Pub.L. No. 104-104, 110 Stat. 56 (1996).  Consistent with this purpose, the Act

contains mechanisms designed to open the formerly monopolistic local telephone service markets to

competition. *Southwestern Bell Telephone Co. v. Brooks Fiber Communications, Inc.*, 235 F.3d 493, 495 (10th Cir. 2000).

In order to facilitate market entry by competing local exchange carriers ("CLECs") such as e.spire, the Act imposes a multitude of duties on incumbent local exchange carriers ("ILECs"), such as Qwest. *See* 47 U.S.C. § 251. Foremost among these duties is the duty to interconnect ILEC networks with CLEC networks. 47 U.S.C. § 251(c)(2). Interconnection ensures that consumers who subscribe to one local telephone service can receive calls from, and place calls to, those who subscribe to a different local service. 47 U.S.C. § 251(c)(2)(A). The Act directs ILECs to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(6). Reciprocal compensation is designed to compensate one LEC for terminating calls that originated on another LEC's network. *Brooks Fiber,* 235 F.3d at 495.

Both ILECs and CLECs must attempt to negotiate the terms and conditions of interconnection agreements in good faith. 47 U.S.C. §§ 251(c)(1); 252(a)(1). At any point in the negotiations, a negotiating party may request the governing state commission to mediate any differences arising in the course of the negotiations. 47 U.S.C. § 252(a)(2). Within a specific time frame, a negotiating party may petition the state commission to arbitrate any open issues left in the interconnection agreement. 47 U.S.C. § 252(b). Thus, any given interconnection agreement may contain negotiated, mediated and arbitrated terms.

Regardless of the manner in which the terms of an interconnection agreement were reached, an interconnection agreement is not final until approved by the governing state commission. 47 U.S.C. § 252(e). A party aggrieved by the state commission's decision regarding an interconnection agreement may bring an action in federal district court. 47 U.S.C. § 252(e)(6). Federal court review

under the Act is limited to the determination of whether an interconnection agreement meets the requirements of Sections 251 and 252. *Id.*

## II.     The Interconnection Agreement Between e.spire and Qwest

After the Telecommunications Act took effect in February 1996, e.spire's predecessor, American Communications Services, Inc. (hereinafter "ACSI") requested interconnection, service and unbundled network elements from U.S. West, the predecessor of Qwest.  (Qwest Ex. 8,  Pet. for Arbitration of ACSI at 1.)  When the parties were unable to negotiate all of the terms of the Interconnection Agreement, ACSI petitioned the New Mexico State Corporation Commission (hereinafter "NMSCC"), the predecessor of NMPRC, to arbitrate unresolved issues in the interconnection negotiations between ACSI and U.S. West.  (NMPRC Ex. A1, Recommended Decision, NMPRC Utility Case No. 3043 at 10.)  ACSI sought, *inter alia*, "arbitration of issues concerning compensation for the transport and termination of traffic exchanged between the parties." (Qwest Ex. 8 at 1-2.)  ACSI advocated a "bill and keep" mechanism waiving compensation for the costs of terminating and transport of local traffic exchanged between its network and that of U.S. West.  (Qwest Ex. 8 at 5.)  ACSI anticipated that reciprocal compensation would be unnecessary because the volumes of traffic exchanged between the networks would be approximately equal. (Qwest Ex. 8 at 8.)

In the event that the NMSCC determined that the parties should compensate each other for any net differential in traffic, ACSI requested that the compensation rate be based on the total element long run incremental costs ("TELRIC") of U.S. West to transport and terminate traffic.  (Qwest Ex. 8 at 8.)  At that time the TELRIC information had not been developed, and ASCI requested that the

NMSCC order U.S. West to develop TELRIC-based rates within six months.  (*Id.*)  ACSI took the position that the NMSCC should set interim rates in accordance with defaults established in the FCC's Interconnection Order until TELRIC-based rates were developed.  (Qwest Ex. 8 at 15.)  ASCI specifically proposed that the parties should charge rates between $0.002 and $0.004 per minute of use (hereinafter "MOU") for end office termination.  (*Id.*)  In a post hearing brief, ACSI stated that a rate should not be set at that time so that an approximate, negotiated rate could be "selected to reflect the circumstances at the time that traffic is out of balance."  (Qwest Ex. 9, Portion of Brief Submitted at May 12, 2003 Oral Argument.)

On December 6, 1996, the NMSCC issued its Findings of Fact and Conclusions of Law on the ACSI/U.S. West arbitration.  (Qwest, Ex. 1, Findings of Fact and Conclusions of Law, NMSCC Docket No. 96-307 TC, Dec. 6, 1996.)  At paragraph 80, the NMSCC stated that "[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket."  (*Id.*)  The NMSCC further noted that U.S. West opposed the bill and keep system because such a system would encourage carriers to avoid costs artificially and provide a strong incentive to overuse the service.  (*Id.*)  U.S. West suggested a reciprocal compensation mechanism whereby each party would bill the other for terminating calls and the billing rate would be equal to the estimated TELRIC.  (Qwest, Ex. 1, ¶ 82.)  U.S. West proposed that the traffic be handled on a bill and keep basis so long as the difference in traffic volume was less than five percent, but that a reciprocal compensation system should apply if the five percent threshold were exceeded.  (Qwest, Ex. 1, ¶ 85.)  The NMSCC adopted U.S. West's proposal, but ordered that the billing be done on a quarterly basis in response to ACSI's concerns regarding billing costs.  (Qwest, Ex. 1, ¶ 87.)

ACSI and U.S. West filed a Motion for Clarification on January 23, 1997. (NMPRC Ex. A1 at 11.) The NMSCC issued an Order resolving the Motion for Clarification on March 3, 1997, and directed ACSI and U.S. West to prepare and file an Interconnection Agreement consistent with its arbitration Findings of Fact and Conclusions of Law within three days. (*Id*. at 11-12.) ASCI and U.S. West filed the Interconnection Agreement on March 10, 1997. (*Id*. at 12.) The NMSCC approved the Interconnection Agreement on April 9, 1997. (*Id*.)

### III.    Administrative Complaint

On March 17, 1998, ACSI filed a complaint with NMPRC, f/k/a NMSCC, alleging that U.S. West had failed to pay reciprocal compensation to ACSI for terminated calls to Internet Service Providers (ISPs) pursuant to the Interconnection Agreement at the rates approved in the Interconnection Agreement. (NMPRC Ex. A1 at 11.) U.S. West asserted that it was not obligated to pay reciprocal compensation because the traffic was not out of balance because the Interconnection Agreement excluded terminated calls to ISPs, or in the alternative, that any payment should be at the contract rate and then at the rate established by the Commission in two separate cases known as the "Costing Dockets."[1]

NMPRC referred the matter to Elizabeth Hurst, Esq., Hearing Examiner. e.spire, f/k/a ACSI, and U.S. West stipulated to the amount of terminated traffic in MOU that e.spire had terminated for U.S. West. (NMPRC Ex. A1 at 12.) e.spire admitted that if ISP-bound traffic had been excluded

---

[1] The Costing Docket cases were styled and numbered *In the Matter of the Consideration of the Adoption of a Rule Concerning Costing Methodologies*, NMPRC Docket No. 96-310 TC, and *In the Matter of Implementation of New Rules Related to the Rural High Cost and Low Income Components of the New Mexico Universal Service Fund*, NMPRC Docket No. 96-334 TC.

from the calculation, the local traffic between the parties was in balance. (*Id.*) After a "lengthy and arduous procedural journey," Hearing Examiner Hurst held a hearing on June 12, 2000. (NMPRC Ex. A1 at 7; 9.)

On February 15, 2001, Hearing Examiner Hurst issued a Recommended Decision recommending that the Commission find that the Interconnection Agreement required U.S. West to pay reciprocal compensation to e.spire for termination of ISP bound traffic, that the appropriate compensation rate was the interim rate set out in the Interconnection Agreement, or $0.0029585 per MOU, for minutes terminated before September 1998, and that the rate established by the Costing Docket Order on August 25, 1998, or $0.0011083 per MOU, should apply to minutes terminated during and after September 1998. (NMPRC Ex. A1 at 23; 26-27.) Hearing Examiner Hurst further recommended that the Commission find that U.S. West was in breach of the Interconnection Agreement, that U.S. West should immediately pay e.spire reciprocal compensation owed, as well as any late payment fees that may have been due under the terms of the Interconnection Agreement. (*Id.* at 26-27.)

Both e.spire and Qwest, f/k/a U.S. West, filed Exceptions to the Recommended Decision. (NMPRC Ex. A at 2.) On March 5, 2002, the NMPRC issued its Final Order on Recommended Decision adopting the reasoning of Hearing Examiner Hurst as to the classification of the ISP bound traffic and the appropriate rates for compensation, ordering Qwest to immediately pay the amount of reciprocal compensation owed, and remanding the issue of calculation of late payment charges to Hearing Examiner Hurst. (NMPRC Ex. A at 14.) NMPRC observed that its Order in the arbitration case plainly declared that "[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket." (NMPRC Ex. A at 8.)

After the Commission issued its Final Order on Recommended Decision, e.spire and Qwest filed additional motions.  On April 16, 2002, the Commission issued an Order On Various Motions, denying e.spire's request for reconsideration and directing Hearing Examiner Hurst to consider Qwest's Motion for Settlement Agreement and Dismissal as well as the late payment charge issue. (NMPRC Ex. D.)

### IV.    Case Summary

e.spire filed its Complaint in this Court on May 2, 2002.  In its Amended Complaint filed on May 3, 2002, e.spire alleges the following claims under the Telecommunications Act of 1996, the United States and New Mexico Constitutions, and 42 U.S.C. § 1983:

1.    Pursuant to 47 U.S.C. § 252(e)(6), the Court should reverse NMPRC's decision that Qwest is not required to pay e.spire for termination of traffic at the rate of $0.0029585 per MOU because the determination is erroneous as a matter of law and is arbitrary and capricious.

2.    NMPRC committed legal error under the Act by failing to give effect to the plain and unambiguous language of the provisions of the Interconnection Agreement.

3.    NMPRC committed legal error by imposing the NMPRC's costing docket rate for termination of local traffic and in effect conducted an arbitration contrary to the procedures established by 47 U.S.C. § 252.

4.    The imposition of the costing docket rate of $0.0011083 rather than $0.0029585 was arbitrary and capricious discrimination without rational justification in violation of e.spire's rights to equal protection and substantive due process under the United States and New Mexico Constitutions.

5.    The imposition of the costing docket rate was an unconstitutional taking of property without just compensation in violation of e.spire's rights under the United States and New Mexico Constitutions.

6.    Qwest is in breach of the Interconnection Agreement by refusing to make payments at the contract rate and NMPRC committed legal error by ignoring the plain and unambiguous language of the Interconnection Agreement and by failing to enforce the Interconnection Agreement.

7.    e.spire is entitled to an Order permanently enjoining NMPRC from enforcing the portion of the Final Order that fails to direct Qwest to pay the contract rate of $0.0029585 per MOU.

8.      e.spire is entitled to damages under 42 U.S.C. §1983 from NMPRC because NMPRC acted under color of state law to deprive e.spire of its rights, privileges and immunities under the Constitution and laws of the United States.

e.spire seeks a declaratory judgment that NMPRC's decision to impose the Costing Docket rate instead of the rate established by the Interconnection Agreement was legal error and in violation of state and federal law; a declaratory judgment that the rate established by the Interconnection Agreement applies to Qwest traffic terminated by e.spire; a permanent injunction barring NMPRC from enforcing its decision that the disputed traffic is subject to a rate other than $0.0029585 per MOU; an order directing NMPRC to order Qwest to make immediate payment of all amounts due under the Interconnection Agreement at the rate of $0.0029585 per MOU, plus late charges and penalties and to continue to make timely reciprocal compensation payments; as well as damages, costs and attorney fees.

Qwest answered on May 22, 2002, and asserted that e.spire failed to state a claim.  NMPRC answered on May 23, 2002, asserting the affirmative defenses of failure to state a claim, the Final Order was supported by substantial evidence and met all the requirements of 47 U.S.C. §§ 251 and 252; e.spire's constitutional claims were not ripe and were without merit; there was no final agency action because the determination of the amount of late charges and the issue of whether to approve of a settlement agreement between e.spire and Qwest was remanded to the Hearing Examiner; the takings claims are barred by the Johnson Act, 28 U.S.C.§1342 and were without basis; and e.spire had an adequate state remedy and had appealed to the NMSC.[2]

On August 12, 2002, Qwest filed a Motion for Partial Summary Judgment, arguing that there

_____

[2]  The state appeal has been withdrawn. "No state court shall have jurisdiction to review the action of a state commission in approving or rejecting an agreement under §252."  47 U.S.C. §252(e)(4).

were no genuine issues of material fact presented by the Fourth, Fifth or Eighth Causes of Action.

On October 15, 2002, NMPRC filed a Motion to Dismiss, arguing that none of the claims were ripe

for judicial review and that the Complaint was untimely.  On the same day, NMPRC filed a Motion

for Partial Summary Judgment, asserting that it's actions were fully authorized by law and that it was

entitled to summary judgment on the Constitutional and Section 1983 claims.  On January 27, 2003,

e.spire filed its Brief-in-Chief on all issues.  Timely responses and replies were filed to all motions and

briefs.  On May 12, 2003, I heard oral argument on all pending issues.  At the hearing, Defendant

Qwest tendered ACSI's Petition for Arbitration dated August 13, 1996 in the case styled and

numbered *In the Matter of the Petition by ACSI for Arbitration with U.S. West*, NMPRC Docket No.

96-307 TC and Pages Three and Four of e.spire's Post-Hearing Brief in the case styled and numbered

*In the Matter of the Petition by ACSI for Arbitration with U.S. West*, NMPRC Docket No. 96-307

TC.  These documents were admitted without objection and have been filed as Defendant Qwest

Exhibits 8 and 9.


## V.    Discussion.

### A.    Whether NMPRC's Motion to Dismiss should be granted.

NMPRC moves to dismiss on the grounds that e.spire's Complaint is time-barred and that

none of the claims are ripe for judicial review.  In ruling on a motion to dismiss, the court must accept

all well-pleaded factual allegations of the complaint as true and view them in the light most favorable

to the non-moving party.  *See Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1236

(10th Cir. 1999).  In accepting the complaint's allegations as true, the court must consider whether the

complaint, standing alone, is legally sufficient to state a claim upon which relief may be granted.  *See*

*Ordinance 59 Ass'n v. United States Dep't of Interior Sec'y*, 163 F.3d 1150, 1152 (10th Cir. 1998).

Where a party challenges the facts upon which subject matter jurisdiction depends pursuant to Rule

12(b)(1), "'a district court may not presume the truthfulness of the complaint's factual allegations.

A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing

to resolve disputed jurisdictional facts under Rule 12(b)(1).'" *Sizova v. Nat. Inst. of Standards &*

*Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002) (*quoting Holt v. United States*, 46 F.3d 1000, 1003 (10th

Cir. 1995)).  Reliance on evidence outside the pleadings in addressing such a motion does not, as a

general rule, convert the motion to one for summary judgment under Fed.R.Civ.P. 56.  *Sizova,* 282

F.3d at 1324; *see, e.g. Jones v. Runyon*, 91 F.3d 1398, 1400 (10th Cir. 1996) (holding that court

should examine both plaintiff's administrative charge and district court complaint in assessing subject

matter jurisdiction).

        NMPRC contends that the Complaint was untimely.  NMPRC issued its Final Order on

Recommended Disposition on March 5, 2002, and its Order on the Motion to Reconsider on April

16, 2002.  e.spire filed its Complaint in federal court on May 2, 2002.  Because the

Telecommunications Act does not contain a deadline for filing an appeal in federal court from

decisions of state commissions, NMPRC asserts that the court should look to analogous state law to

determine the filing deadline.  *See Reynolds v. Sch. Dist No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995)

(applying Colorado's two-year statute of limitations for personal injury actions to claim brought

under 42 U.S.C. §1981).  According to NMPRC, the analogous state law is NMSA 1978, § 63-9A-

14, which provides that appeals from an action of the NMPRC under the New Mexico

Telecommunications Act must be filed with the New Mexico Supreme Court within thirty days of

entry of the final order by the NMPRC.

This case is brought under 47 U.S.C. § 252(e)(6), a provision of the federal Telecommunications Act of 1996, as well as the United States and New Mexico Constitutions and §1983. It is not brought under the New Mexico Telecommunications Act. It is well-established that New Mexico's three-year personal injury cause of action applies to claims brought under 42 U.S.C.§ 1983. *Garcia v. Wilson*, 731 F.2d 640, 651 (10th Cir. 1984). Thus, a three year statute of limitations applies to the §1983 claims.

The applicable statute of limitations for the Telecommunications Act claims is not the same a the statute of limitations for the §1983 claims. A federal cause of action borrows an analogous state limitations period only if federal law supplies no controlling limitations period. *See Manning v. Fairfax County Sch. Bd*., 176 F.3d 235, 237 (4th Cir. 1999) (*citing County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 (1985)). With respect to federal laws enacted after December 1, 1990, there is a general federal statute of limitations that provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than four years after the cause of action accrues." 28 U.S.C. § 1658(a). At least two district courts have found that §1658(a), and not an analogous state law provision, governs appeals under 47 U.S.C. §252(e)(6). *See Verizon Maryland Inc. v. RCN Telecomm. Servs., Inc.*, 232 F.Supp.2d 539 (D. Md. 2002); *Bell Atlantic-Pennsylvania, Inc. v. Pa. Pub. Util. Comm'n*, 107 F.Supp.2d 653, 668 (E. D. Pa. 2000). Because the Telecommunications Act was enacted after December 1, 1990, the four-year statute of limitations of §1658 applies to the claims under the federal Telecommunications Act. Therefore the e.spire's Complaint is timely.

NMPRC asserts that all of e.spire's claims should be dismissed because they are not ripe. The Supreme Court has explained that the basic rationale of the ripeness doctrine "is to prevent the courts,

through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  In analyzing ripeness, a federal court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149.

There are three primary factors in the ripeness inquiry: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Signature Props. Intern. Ltd. Partnership v. City of Edmond*, 310 F.3d 1258, 1265 (10th Cir. 2002) (*quoting Roe No.2 v. Ogden*, 253 F.3d 1225, 1231 (10th Cir. 2001)).  Application of the ripeness doctrine, however, "remains a confused mix of principle and pragmatic judgment reflected in its mixture of Article III case and controversy requirements with prudential restraints on the exercise of jurisdiction."  *Coalition for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001) (*quoting Sierra Club v. Yeutter*, 911 F.2d 1405, 1410 (10th Cir. 1990)).

In this case, e.spire contends that it has been "thwarted from recovering" more than $8.5 million that it alleges it is owed for services dating back to 1997.  Furthermore, e.spire Communications Inc. has filed for bankruptcy.  Under these circumstances, delayed review would cause hardship to e.spire.  The first ripeness consideration weighs heavily in favor of e.spire.  The second ripeness factor favors e.spire as well.  The only matters pending before the Hearing Examiner are calculation of late payment fees and whether a settlement agreement providing for a payment of

a portion of past due amounts owed while preserving the right to contest the appropriate rate is enforceable. The fundamental issue raised in the instant proceeding is whether the NMPRC erred in modifying the rate for terminated ISP calls from $0.0029585 per MOU to $0.0011083 per MOU as of September 1998. Judicial review of this discrete issue would not inappropriately interfere with further agency action. Finally, the facts with respect to the rate issue are sufficiently developed to allow meaningful review under the federal Telecommunications Act and further factual development of the issues presented would not be beneficial. Having weighed these considerations, I conclude that e.spire's claims are ripe for judicial review.

NMPRC additionally argues that e.spire's taking and related due process claims are not ripe because e.spire has not pursued state remedies to recover compensation for the alleged taking. In *Williamson County Reg'l Planning Comm'n. v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court held that a regulatory takings claim against a state is not ripe until (1) the state agency imposing the allegedly confiscatory regulation has taken final action against the plaintiff's property and (2) the plaintiff has pursued all available remedies under state law. *Id.* at 186-97. The finality requirements are the same for due process claims and for takings claims. *Signature Props.*, 310 F.3d at 1266 (*citing Landmark Land Co. v. Buchanan*, 874 F.2d 717, 722 (10th Cir. 1989)).

e.spire alleges that the NMPRC deprived it of a contractual "right" to reciprocal compensation for termination of ISP traffic at the interim rate of $0.0029585 per MOU indefinitely. e.spire raised the rate issue before the NMPRC, which issued a final decision on that same issue. NMPRC has not identified any other state remedy that e.spire could have pursued under state law to vindicate its alleged right to reciprocal compensation at the interim rate. Indeed, the sole remedy for review of a state commission's interpretation of interconnection agreement under the Telecommunications Act

lies in the federal courts.  *See* 47 U.S.C. §252(e)(6).  The NMPRC has issued a final decision on the reciprocal compensation rate.   e.spire has pursued all available remedies under state law. Accordingly, the ripeness doctrine does not bar e.spire's takings and due process claims.

**B.      Whether Defendants Qwest and NMPRC are entitled to summary judgment on Plaintiff's Fourth, Fifth and Eighth Causes of Action.**

   **1.      Introduction.**

Defendants Qwest and NMPRC argue that they are entitled to summary judgment on Plaintiff's Fourth, Fifth and Eighth Causes of Action.  In its Fourth Cause of Action, e.spire contends that NMPRC's imposition of the Costing Docket rate of $0.0011083 per MOU rather than the negotiated rate of $0.0029585 per MOU was arbitrary and capricious discrimination without rational justification in violation of e.spire's rights to equal protection and substantive due process under the United States and New Mexico Constitutions.  In its Fifth Cause of Action, e.spire contends that the imposition of the Costing Docket rate was an unconstitutional taking of property without just compensation in violation of e.spire's rights under the United States and New Mexico Constitutions. In its Eighth Cause of Action, e.spire claims it is entitled to damages under 42 U.S.C. §1983 from the NMPRC because the NMPRC acted under color of state law to deprive e.spire of its rights, privileges and immunities under the Constitution and laws of the United States.

   **2.      Summary Judgment Standard.**

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact.' " *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting

Rule 56(c).  When applying this standard, the court examines the record and makes all reasonable

inferences in the light most favorable to the non-moving party.  *Id.*

### 3.    Rule 56(f) Motion.

In Response to Qwest's Motion for Summary Judgment, e.spire maintains that discovery is

necessary before the court can rule on the motions for summary judgment.  *See* FED.R.CIV.P. 56(f).

In support of this assertion, e.spire submits the affidavit of James C. Falvey, Senior Vice President

for Regulatory Affairs for e.spire dated July 22, 2002.  (Pl. Ex. B.)  Mr. Falvey states in his affidavit

that most of the terms of the e.spire/Qwest Interconnection Agreement were negotiated, that Qwest

failed to produce the agreement it had reached with GST, that Hearing Examiner Hurst failed to order

Qwest to produce the GST agreement, that Qwest's failure to produce the GST agreement had an

adverse impact on e.spire's prosecution of its case before the NMPRC, and that e.spire should have

the opportunity to engage in discovery concerning the GST agreement.  (*Id.*)  e.spire also argues that

material facts are in dispute as to whether the call termination rate was established in the arbitration,

and whether the costing docket established uniform rates superceding the rates in the Interconnection

Agreement.  Finally, e.spire asserts that the entire record before the NMPRC needs to be before the

court before a decision may be rendered.

In the Initial Pretrial Report (hereinafter "IPTR"), counsel stipulated that no discovery was

necessary.[3]  (IPTR at 7.)  The IPTR was filed on August 19, 2002, after counsel participated in an

---

[3] Interestingly, counsel further stipulated to the authenticity of the Confidential Billing Dispute and Settlement Agreement and Release Between U.S. West and GST dated January 7. 2000, implying that e.spire had access to the GST agreement. (IPTR at 2.)

initial scheduling conference before the Honorable Richard L. Puglisi, United States Magistrate

Judge.  The IPTR was signed by counsel, and then approved by Judge Puglisi and myself.  The IPTR

as entered controls the subsequent course of the action unless modified by a subsequent order. *See*

FED.R.CIV.P. 16(e).

e.spire stipulated that no discovery was necessary in the IPTR after the Falvey affidavit was

executed.  e.spire has failed to explain how the GST settlement agreement relates to the issues of this

case, why additional discovery is necessary, or how additional information would enable e.spire to

more fully respond to the motions.  As it now stands, the record contains sufficient material facts to

permit a ruling on all pending issues.  Under these circumstances, e.spire's Rule 56(f) request for

discovery should be denied.

**4.      Fourth Cause of Action.**

Defendants argue that they are entitled to summary judgment on e.spire's Fourth Cause of

Action because the equal protection and due process claims cannot survive rational basis review.

Subject matter jurisdiction over the federal Constitutional claims arises under 28 U.S.C. § 1331, and

supplemental jurisdiction arises over the state constitutional claims under 28 U.S.C. § 1367(a).

The Equal Protection Clause provides that "[n]o state shall ... deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The New Mexico

Constitution also provides that no person shall be "denied equal protection of the laws." N.M. Const.

art. II, § 18.  The equal protection clauses in the United States and New Mexico Constitutions are

co-extensive.  *See Valdez v. Wal-Mart Stores, Inc.*, 124 N.M. 655, 657, 954 P.2d 87, 89 (Ct. App.

1998). Equal protection of the laws "is essentially a direction that all persons similarly situated should

be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

17

Governmental classifications are subject to strict scrutiny if they target a suspect class or involve a fundamental right. *Save Palisade Fruit Lands v. Todd*, 279 F.3d 1204, 1212 (10th Cir. 2002).  In the absence of a suspect classification or the denial of a federal fundamental right, the state regulation need only be rationally related to a legitimate government purpose.  *Id.*

e.spire does not argue that it is a member of a suspect class or was denied a fundamental right. It has long been established that differing treatment of specific entities in economic regulation is clearly permissible for equal protection purposes so long as the treatment is rationally related to a legitimate governmental interest and does not trammel fundamental personal rights or draw upon inherently suspect distinctions such as race, religion, or alienage.  *City of New Orleans v. Dukes*, 427 U.S. 297, 304-06 (1976).  Thus, the imposition of the Costing Docket rate by NMPRC to the Interconnection Agreement "need only bear a 'rational relation to some legitimate end to satisfy the Equal Protection Clause.'"  *Save Palisade Fruit Lands*, 279 F.3d at 1213 (*quoting Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001)).

The Act charges state commissions with the responsibility for setting just and reasonable rates that are cost-based and non-discriminatory.  47 U.S.C. § 251(b)(5). The action of NMPRC in modifying the ISP call termination rate was rationally related to the legitimate state interest in ensuring greater competition in the local telephone services market.  *See Brooks Fiber*, 235 F.3d at 498 (state commissions have authority to interpret and enforce interconnection agreements).  Indeed, e.spire took the position in its application for arbitration that any reciprocal compensation rate should be TELRIC-based and that an interim rate should be set until a TELRIC-based rate was developed. (Qwest Ex. 8 at 8; 15.)

e.spire has failed to allege or show that imposition of the Costing Docket rate was

18

discriminatory.  The record shows that NMPRC arrived at the Costing Docket rate through the use of forward-looking cost studies.  (Qwest Ex. 3 at ¶ 210 and Ex. 3 at ¶ 51.)  The Costing Docket also ensured that the interconnection rates were applied to all interconnection agreements in New Mexico, and not just to the agreement between e.spire and Qwest.  (*Id.*)  The imposition of the rate set by the Costing Docket was rationally related to the legitimate state interests in setting just and reasonable rates and ensuring greater competition in the local telephone services market.  There is no genuine issue as to any material fact and e.spire's equal protection claims fail as a matter of law.  Accordingly, Defendants are entitled to summary judgment on e.spire's equal protection claims.

Defendants further argue that e.spire's substantive due process claim as alleged in the Fourth Cause of Action fail as a matter of law because e.spire had not alleged a protectible property interest and cannot survive rational basis review.[4]  The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law.  U.S. Const. amend. XIV.  Substantive due process ensures that a state will not deprive a party of property for an arbitrary reason.  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).  e.spire has not presented any authority that the standard for substantive due process under the New Mexico Constitution differs from the standard for substantive due process under the United States Constitution.  *See Christian Child Placement Serv. of New Mexico Christian Children's Home v. Vestal*, 125 N.M. 426, 430, 962 P.2d 1261, 1265 (Ct. App. 1998) (when there is no established precedent, party seeking relief under state constitutional provision must provide reasons for

---

[4]e.spire does not assert a procedural due process claim.  Any such attempt would fail because even assuming a protectible property right for procedural due process purposes, e.spire cannot show on the facts alleged that it did not receive the process it was due.  *See generally Los Angeles v. David*, 538 U.S. ____, 123 S.Ct. 1895, slip op. at 3 (May 19, 2003); *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

interpreting state provision differently from the federal provision).  Therefore, e.spire's substantive due process under the New Mexico Constitution will be analyzed under the federal standard.

The Supreme Court defines "property" in the context of the Fourteenth Amendment's Due Process Clause as a "legitimate claim of entitlement" to some benefit created and defined by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Whether a property interest exists depends on the degree of discretion given the decision maker and not on the probability of the decision's favorable outcome. *Carey v. Piphus*, 435 U.S. 247, 266 (1978).  In order to prevail on either a substantive or procedural due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest.  *Hyde Park*, 226 F.3d at 1210 (*citing Weathers v. West Yuma County Sch. Dist. R-J-1*, 530 F.2d 1335, 1340-42 (10th Cir. 1976)).

e.spire acknowledged in its Petition for arbitration that temporary rates were necessary pending completion of TELRIC studies.  The Findings of Fact and Conclusions of Law on the arbitration that gave rise to the Interconnection Agreement clearly stated that the rates set in the arbitration were interim rates pending completion of the Costing Docket cases.  e.spire has shown nothing more than a unilateral expectation that the interim rate would apply indefinitely.  A unilateral expectation is insufficient to establish a protectible property interest as a matter of law.  *Roth*, 408 U.S. at 577.  e.spire did not have a protectible property interest in the interim rate after a permanent TELRIC-based rate was set by NMPRC

Even if e.spire had established a fundamental property interest in the application of the interim rate for an indefinite period, the denial of that interest was did not violate due process.  Substantive due process requires only that termination of a protected interest not be arbitrary, capricious, or

without a rational basis. *Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998). NMPRC arrived at the Costing Docket rate after it held public hearings, received evidence, including cost-based studies, and considered the positions of all interested parties. (Qwest Exs. 3 and 6.) e.spire has failed to establish a genuine issue of material fact as to whether NMPRC acted arbitrarily and capriciously or without rational basis in setting the ISP call termination rate at the Costing Docket rate as of September 1998. Defendants are entitled to summary judgment on e.spire's substantive due process claims.

     **5.**     **Fifth Cause of Action.**

     Defendants also argue that they are entitled to summary judgment on e.spire's takings claim. Private property may not be taken for public use without just compensation." U.S. CONST. amends. V, XIV. NM Const. art. II, § 20. In order to prevail on its takings claims, e.spire must establish a protectible property interest is involved and that the governmental action is a taking without just compensation. *Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 16 (1st Cir. 1999). The New Mexico state constitutional takings provisions parallels the federal Takings Clause. *Estate and Heirs of Sanchez v. County of Bernalillo*, 120 N.M. 395, 397, 902 P.2d 550, 552 (1995).

     The threshold question is whether the plaintiff has identified a property interest cognizable under the Fifth Amendment. *See M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995). If the plaintiff satisfies the prerequisite of identifying a cognizable property interest, which has been labeled a "bedrock requirement," the court considers whether the governmental action at issue constituted a taking of that property interest. *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (*quoting Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001)). Because e.spire does

not have a property right in application of the interim rate for an indefinite period, it cannot assert a viable takings claim under the Fifth Amendment.

Even if e.spire could establish a property right in continuing to charge the interim rate during and after September 1998, it has not demonstrated that NMPRC perpetrated a taking without just compensation. Governmental interference with private property rights is not absolutely prohibited. *Gordon v. Norton*, 322 F.3d 1213, 1217 (10th Cir. 2003) (*citing First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314-15 (1987)).  Instead, the Takings Clause requires compensation only for a "proper interference amounting to a taking." *Gordon*, 322 F.3d at 1217; *Puerto Rico Tel. Co.*, 189 F.3d at 16-17.

A utility operating in a highly regulated industry should expect that its business will be frequently affected by government action.  *Connolly v. Pension Benefit Guar. Corp*. 475 U.S. 211, 227 (1986).  Relevant factors in considering whether there was a taking include the character of the government action, its economic impact on the plaintiff, and the degree to which it interferes with plaintiff's reasonable, investment backed expectations.  *Puerto Rico Tel. Co.*, 189 F.3d at 17.  The alleged property right involved in this case is a purported contractual "right" to payment at a discrete rate under the Interconnection Agreement.  However, the law is clear that interconnection agreements are subject to regulation by the NMPRC. *Sprint,* 275 F.3d at 1245; *Brooks Fiber*, 235 F.3d at 497. The Interconnection Agreement between e.spire and Qwest was subject to the continuing regulation and oversight of NMPRC.  *Sprint,* 275 F.3d at 1245*; Brooks Fiber*, 235 F.3d at 497.

The actions of the NMPRC were authorized by the federal Telecommunications Act. Although the NMPRC ruled that e.spire would not be compensated at the interim rate during and after September 1998, it also required Qwest to compensate e.spire for terminating ISP traffic at the

just and reasonable cost-based rate established in the Costing Docket.  The actions of the NMPRC did not unduly interfere with e.spire's reasonable, investment backed expectations.  e.spire has failed to establish a genuine issue of material fact with respect to its takings claims.  Defendants are entitled to summary judgment on the Fifth Cause of Action.

### 6.    Eighth Cause of Action.

Defendants that they should be granted summary judgment on e.spire's claim for damages under 42 U.S.C. §1983 from NMPRC for deprivation of its "rights, privileges and immunities" under the Constitutional and laws of the United States.  A plaintiff seeking to bring suit pursuant to § 1983 must demonstrate that it suffered a deprivation of a federally protected right.  *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003).  Because none of e.spire's federal Constitutional claims are viable in this case, they cannot not support a claim under 42 U.S.C. §1983.

e.spire argues that it is entitled to bring a § 1983 claim based on deprivations under the Telecommunications Act, relying on the Eleventh Circuit's opinion in *AT&T Wireless PCS, Inc. v. City of Atlanta*, 210 F.3d 1322 (11th Cir. 2000).  As the Honorable M. Christina Armijo, United States District Judge, observed almost a year ago in *Qwest Corp. v. City of Santa Fe*, 224 F.Supp.2d 1305, 1314 (D. N.M. 2002), the Eleventh Circuit vacated its opinion pending rehearing *en banc, see AT&T Wireless PCS Inc. v. City of Atlanta*, 260 F.3d 1320 (11th Cir. 2001), and the parties later stipulated to dismissal of the appeal, *see AT&T Wireless PCS, Inc. v. City of Atlanta*, 264 F.3d 1314 (11th Cir. 2001).  In a cogent analysis, relying on *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 2275-77 (2002), as well as other convincing authority, Judge Armijo concluded that the plaintiff could not rely on the Telecommunications Act to bring a claim under 42 U.S.C. § 1983.  I

find Judge Armijo's rationale persuasive and hereby adopt it.  Because none of e.spire's federal Constitutional claims are viable, and the Telecommunications Act cannot support a claim under § 1983, Defendants are entitled to summary judgment on the Eighth Cause of Action.


### C.     Whether Plaintiff is entitled to relief on the merits.

Plaintiff argues in its Brief-in-Chief that a *de novo* standard of review applies to the NMPRC's legal interpretations, that the NMPRC violated federal law when it failed to enforce a term of the Interconnection Agreement establishing the call termination rate of $0.0029585 per MOU, that reformation of the Interconnection Agreement is not permitted by the Act, that NMPRC may not rely on perceived authority under state law to contravene the Act, that the choice of law provision in the Interconnection Agreement required the NMPRC to interpret the Interconnection Agreement in accordance with Colorado law, that the call termination rate is unambiguously set forth in the Interconnection Agreement, that extrinsic evidence supports the position that the correct call termination rate is the rate set forth in the Interconnection Agreement, and that NMPRC's alteration of the call termination rate unconstitutionally impaired Plaintiff's rights under the Interconnection Agreement.

Congress authorized state commissions to approve, interpret and enforce interconnection agreements through the Telecommunications Act.  47 U.S.C. § 252; *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 477 (2002).  The Act provides for federal court review of state commission decisions concerning interconnection agreements.  47 U.S.C. § 252(e)(6).  The Supreme Court and the Tenth Circuit have issued controlling precedent setting out the appropriate scope and standard for judicial review of state commission decisions concerning interconnection agreements.  *Verizon*

*Communications, Inc. v. FCC*, 535 U.S. at 477; *Southwestern Bell Tel. Co., v. Apple*, 309 F.3d 713, 717 (10th Cir. 2002); *Brooks Fiber*, 235 F.3d at 498.  The Tenth Circuit applies a *de novo* standard when reviewing state commissions' interpretations of the Act and it regulations.  *Apple*, 309 F.3d at 717; *Brooks Fiber*, 235 F.3d at 498.  Once it is determined that state commissions properly interpreted the Act and its regulations, federal courts in the Tenth Circuit apply an arbitrary and capricious standard to review all remaining determinations.  *Apple*, 309 F.3d at 717; *Brooks Fiber*, 235 F.3d at 498.

NMPRC has statutory authority to interpret and enforce the Interconnection Agreement under 47 U.S.C.§ 252.  e.spire maintains that NMPRC lacked such authority because the call termination rate was negotiated and was not arbitrated.  This position is not bourne out by the record.  In its Petition for Arbitration, e.spire f/k/a ACSI sought, *inter alia*, "arbitration of issues concerning compensation for the transport and termination of traffic exchanged between the parties."  (Qwest Ex. 8 at 1-2.) e.spire advocated a "bill and keep" mechanism waiving compensation for the costs of terminating and transporting of local traffic exchanged between its network and that of U.S. West.  (Qwest Ex. 8 at 5.)  e.spire anticipated that reciprocal compensation would be unnecessary because the volumes of traffic exchanged between the networks would be approximately equal.  (Qwest Ex. 8 at 8.)

In the alternative, e.spire requested that the compensation rate be TELRIC-based and that the NMPRC, f/k/a NMSCC should set interim rates in accordance with defaults established in the FCC's Interconnection Order until TELRIC-based rates were developed.  (Qwest Ex. 8 at 8-5.)  e.spire specifically proposed that the parties should charge rates between $0.002 and $0.004 per MOU.  (*Id.*) In a post hearing brief, e.spire stated that a rate should not be set at that time so that an approximate,

negotiated rate could be "selected to reflect the circumstances at the time that traffic is out of balance." (Qwest Ex. 9, Portion of Brief Submitted at May 12, 2003 Oral Argument.)

At paragraph 80 Findings of Fact and Conclusions of Law, the NMPRC stated that "[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket." (Qwest, Ex. 1.) The NMPRC further noted that Qwest f/k/a U.S. West opposed the bill and keep system because such a system would encourage carriers to avoid costs artificially and provide a strong incentive to overuse the service. (*Id.*) Qwest suggested a reciprocal compensation mechanism where each party would bill the other for terminating calls and the billing rate would be equal to the estimated TELRIC. (Qwest, Ex. 1, ¶ 82.) Qwest proposed that the traffic be handled on a bill and keep basis so long as the difference was less than five percent, but that a reciprocal compensation system should apply if the five percent threshold were exceeded. (Qwest, Ex. 1, ¶ 85.) The NMPRC adopted Qwest's proposal, but ordered that the billing be done on a quarterly basis in response to e.spire's concerns regarding billing costs. (Qwest, Ex. 1, ¶ 87.)

After considering the rates proposed by the parties, NMPRC accepted Qwest's proposal and rejected e.spire's alternative proposals. (Qwest, Ex. 1.) NMPRC directed e.spire and Qwest to prepare an interconnection agreement "incorporating the terms of the Commissions foregoing resolution." (Qwest, Ex. 1 at 32.) The Interconnection Agreement explicitly provided that issues such as pricing would remain subject to state tariffs such as those set by the Costing Docket. (Qwest Ex. 2 at 7.)

In its Final Order Adopting Recommended Disposition in this case, NMPRC referred its statement in the Arbitration Findings of Fact and Conclusions of Law that the prices set in the arbitration were interim prices that would remain in effect pending completion of the Costing Docket.

(NMPRC Ex. A.)  NMPRC's adopted Hearing Officer Hurst's finding that e.spire's own legal brief made it clear that the Commission needed to conduct an investigation into cost and price issues and that there was no prior negotiated agreement on a specific termination rate.  (NMPRC Ex. A1 at 22.) Having reviewed this issue *de novo,* I find that the call termination rate was arbitrated and that NMPRC validly exercised its authority to interpret the Interconnection Agreement under 47 U.S.C.§ 252.

The Act authorized NMPRC to resolve issues brought before it for arbitration, 47 U.S.C. § 252(b)(4)(C), and to set rates for interconnection.  47 U.S.C. § 252(c).  The Act requires that rates be just and reasonable, based on cost and non-discriminatory.  47 U.S.C. § 251(b)(5).  A *de novo* review of the record and actions of the NMPRC establishes that e.spire brought the rate-setting issue before the NMPRC for arbitration.  In addition, *de novo* review demonstrates that the Costing Docket rate set by the NMPRC satisfies the requirements of the Telecommunications Act.  Application of the rate of $0.0011083 per MOU to ISP calls terminated by e.spire during and after September 1998 is just and reasonable, cost-based and non-discriminatory and otherwise in compliance with the Act.

e.spire maintains that the NMPRC was powerless to modify the rate set by the Interconnection Agreement because the contract is unambiguous and should be enforced as written under Colorado law.  This argument is somewhat myoptic.  State commissions have inherent authority to interpret and enforce previously-approved interconnection agreements.  *Brooks Fiber*, 235 F.3d at 497.  That is precisely what the NMPRC did in this case.  Interpretation of interconnection agreements may include modification of rates.  For instance, in *Sprint*, 275 F.3d at 1250-51, the Tenth Circuit endorsed the Colorado Public Utilities Commission's interpretation of interconnection agreements that imposed an alternative price/term scheme.  In that case, the CLEC

was permitted to purchase services at specific rates and terms listed in its interconnection agreement, or, alternatively, at the rates and terms set forth in the ILEC's tariffs. The NMPRC clearly acted within its jurisdiction in interpreting the interconnection agreement.

Colorado state law principles govern the interpretation and enforcement of the Interconnection Agreement. The Interconnection Agreement did not arise in a vacuum; it was but one step in a complex and on-going regulatory process. NMPRC correctly applied Colorado contract law in interpreting the Interconnection Agreement. (NMPRC Ex. A.) NMPRC's state law determinations were not arbitrary and capricious. *Brooks Fiber*, 235 F.3d at 498.

At the hearing on e.spire's administrative complaint before Hearing Examiner Hurst, Edward A. Yorkgitis, Jr. and Brad E. Mutschelknaus testified on behalf of e.spire that the call termination rate of $0.0029585 was not arbitrated but was offered by Qwest and accepted by e.spire. (Pl. Exs. A-D.) Hearing Examiner Hurst considered e.spire's position and rejected it because it was not supported by the documents of record, and was contradicted by Paragraph 80 of NMPRC's Findings of Fact and Conclusions of Law in the arbitration case. (NMPRC Ex. A1 at 21.) The NMPRC considered e.spire's exceptions and adopted Hearing Examiner Hurst's determination. (NMPRC Ex. A at 8.) The documents of record demonstrate that in the arbitration, U.S. West and ACSI disagreed on all issues pertaining to reciprocal compensation, including the appropriate rate. The determination by the NMPRC that the call termination rate, as well as the reciprocal compensation mechanism, was set by NMPRC in the arbitration and was not negotiated by the parties was not arbitrary and capricious.

In the Costing Docket, NMPRC reiterated that it had established interim prices for interconnection in a number of arbitrations, including the ASCI/Qwest arbitration. (Qwest Ex. 3 at

¶¶ 13-14.) NMPRC emphasized that it established permanent prices for interconnection in Phase One of the Costing Docket proceeding under its statutory authority to set prices for interconnection. (Qwest Ex. 3 at ¶¶ 13-15.)  e.spire was a party to the Costing Docket proceedings and raised no objections to NMPRC findings that all the rates set in prior arbitrations, including, e.spire's arbitration, were superseded by the permanent rates set in the Costing Docket case.

e.spire argues that the NMPRC impaired its right of freedom of contract claim.  This claim was not raise in any of the pleadings and it not properly before the court.  In its Reply to Responses to Brief-in-Chief, e.spire requests leave to amend its Amended Complaint to include an impairment of contract claim.  This belated request is denied as untimely and futile.  *See Bauchman v. West High Sch.*, 132 F.3d 542, 562 (10th Cir. 1997) (holding that amendment is futile if the proposed amended complaint would not survive either a motion to dismiss or a motion for summary judgment); FED.R.CIV.P. 15(a).  An impairment of right to contract claim would not survive and motion to dismiss or for summary judgment on its merits because the NMPRC's modification of the call termination rate was consistent with Interconnection Agreement and authorized by law.

The decision of NMPRC should be affirmed.


**VI.    Conclusion.**

Upon review of the evidence presented, the Court has determined that Defendant NMPRC's Motion to Dismiss (Doc. 22), filed on October 15, 2002, should be **DENIED**, that Defendant Qwest's Motion for Partial Summary Judgment, (Doc. 8), filed on August 12, 2002, and Defendant PRC's Motion for Partial Summary Judgment, (Doc. 23), filed on October 15, 2002, should be **GRANTED,** and that Defendant NMPRC's Final Order on Recommended Decision should be

**AFFIRMED**.

**WHEREFORE,**

> **IT IS ORDERED** that judgment shall issue in favor of Defendants and against Plaintiff.


_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**
**BY CONSENT AND DESIGNATION**